SHARP *et al. v.* LEARNED.

(Division A.   Oct. 6, 1947.   Suggestion of Error Overruled Jan. 12, 1948.)

[32 So. (2d) 141.   No. 36310.]

394

Butler & Snow, of Jackson, Engle, Laub, Adams & Forman, and L. A. Whittington, all of Natchez, A. H. Jones, of Woodville, and Scholars & Gumby, of Monroe, La , for appellants.

396

Brandon, Brandon, Hornsby & Handy, of Natchez, and Wells, Wells, Newman & Thomas, of Jackson, for appellee.

Argued orally by **George Butler, Sr.**, for appellants, and by **Gerard H. Brandon**, for appellee.

**Roberds, J.**, delivered the opinion of the court.

In the summer and fall of 1937 Learned cut and removed a quantity of timber from a part of the area known as Diamond Island, or Diamond Island Towhead, located some sixteen miles south to south-west of Vicksburg, Mississippi. Sharp and Stricker contend that they were the owners of the timber and the land from which it was cut. They claim only through Louisiana title sources and that the particular land from which the timber was cut was a part of the accretions to Section 7, 8 and 9, Township 15 N, Range 14 E, Madison Parish, Louisiana. On the other hand, Learned claims that he was the owner of the timber and the land on which it was located. He claims only through Mississippi title sources, and it appears that, according to his contention, the timber was upon accretions to Sections 5 and 6, Township 14 N, Range 2 E, Warren County, Mississippi. The Chancellor, on the fourth, or last, trial, from which trial this appeal is taken, found that Learned was the owner and that the land was

located in Mississippi—at least, he found that Sharp and Stricker, as against Learned, were not the owners of the timber. The primary question on this appeal is whether he was manifestly wrong in so finding. In other words, this is purely a question of fact, and, as frankly stated by learned counsel for Sharp and Stricker, they ''have the laboring oar'' to show that the chancellor should be reversed. However, if we should reverse the chancellor on that finding of fact, two other questions would arise, to-wit, (1) whether the suit to recover the value of the timber is barred by the statute of limitations, and (2) whether Sharp and Stricker made proof sufficiently definite and specific of the quantity and value of the timber to constitute the foundation of a personal decree for its value.

As stated, this is the fourth appearance of the case in this Court. A brief history of the proceedings may be of help in understanding the question we now pass upon and its solution.

In November, 1937, Learned filed a bill in the chancery court of Adams County, Mississippi, against Sharp and Stricker, seeking to enjoin them, for reasons stated in the bill, from prosecuting a contemplated suit against him in Madison Parish, Louisiana, to collect from him the value of this timber, and from attaching his land in that Parish and subjecting it to the payment of the judgement if one should be had. Sharp and Stricker answered that bill, denying fraud, and filed demurrers, general and special. The chancellor overruled the demurrers and this Court reversed and remanded the cause. Sharp et al. v. Learned, 182 Miss. 333, 181 So. 142, 182 So. 122.

On remand the bill was amended and respondents again demurred. The chancellor overruled the demurrers and this Court affirmed and remanded the case. Sharp et al. v. Learned, 185 Miss. 872, 188 So. 302.

The cause then proceeded to trial on the issue whether Sharp and Stricker should be permanently enjoined from prosecuting the Lousiana suit, which then had been filed,

against Learned, all the parties being residents of Mississippi and the land, according to complainant Learned, being in Mississippi. At this hearing a great mass of testimony, oral and documentary, including conveyances, tax records, maps, charts, plats, sketches and photographs, was introduced. The chancellor entered a decree making the injunction perpetual. No opinion of the chancellor appears in the record and, therefore, we do not know, with certainty, in which state he found the situs of the land to be. However, it would appear to be inherent in his decree under the pleadings that he found that Sharp and Stricker did not have title to the timber and that the land from which Learned cut timber was located in Mississippi. On appeal this court was of the opinion that, on the record as then made, a part of the land was in Mississippi and a part in Louisiana. However, the judgment entered here merely affirmed the chancellor in granting the injunction and remanded the cause, since, in the opinion, the Court had suggested, for reasons stated, that Sharp and Stricker, on remand, might file a cross bill to obtain a personal decree against Learned for the value of the timber if it should be found on a new trial that Sharp and Stricker were the owners thereof, it being conceded by all parties that Learned was financially able to respond to the personal decree, and that attachment was not necessary for the enforcement of such demand. Sharp and Stricker, on remand of the cause, filed such cross bill. That was the first time they had sought to recover the value of the timber in this suit. When the cause came on for hearing the chancellor announced that he considered the injunction feature at an end; that his granting of the injunction had been affirmed by this Court and that the cause was remanded only for the filing of said cross bill by Sharp and Stricker, and that the only issue remaining to be tried was whether Sharp and Stricker were the owners of the particular land from which the timber had been cut and removed, there being no claim the title to the timber had been severed from the title to

the land. The chancellor further announced that under the then status of the proceedings that the burden was upon Sharp and Stricker to show title to the timber in themselves, and the quantity and value of that cut by Learned. Sharp and Stricker assumed that burden and proceeded as cross-complainants to introduce proof. They introduced the entire record of the evidence made on the immediate prior, or third, trial. A large part of that record —in fact, the greater volume thereof, consisted of the testimony which Learned himself had offered at the third hearing, and which the chancellor had passed upon at that trial. Counsel for all parties then had an agreement to the effect that the Mississippi River had not changed its course by avulsion since 1895-6 to the time of the hearing; that all changes since that time had been by gradual processes. Sharp and Stricker then rested.

Learned, as cross-defendant, also relying upon the record which had been made on the third trial, all of which had been introduced on the fourth hearing by Sharp and Stricker, offered, in addition to that record, the testimony of Dr. H. N. Fisk, including the numerous exhibits as a part of his evidence. Learned then rested. It was upon a consideration of all of this evidence that the chancellor found that the timber Learned cut was located on land lying in Warren County, Mississippi, and that, as between the parties hereto, the title was in Learned, or, at least, that Sharp and Stricker had shown no title in themselves. The question now again recurs. Was the chancellor manifestly wrong?

It would be impossible to reproduce in an opinion the evidence, pro and con, on that question, disclosed by the many maps, plats, charts, sketches and mosaics which are a part of this record, and which were before the chancellor. This Court said that was true on the third appeal. It is doubly so on this one. We can only announce that after prolonged study of the record, we are unable to say, and we could not write an opinion demonstrating, that the chancellor was manifestly wrong. Indeed, we think

he had abundant evidence to support his finding. While we do not try to detail the evidence, or the points for and against that conclusion, we will detail enough to sustain, we think, the statement just made.

As stated, Learned offered on the fourth trial the testimony of Dr. Fisk, which was not before the chancellor on the third trial. He was an associate professor of Geology at Louisiana State University, a consulting geologist of the United States Government, with the rating of Expert Consultant to the President of the Mississippi River Commission. He was a graduate of a number of universities and colleges in the field of geology, with several high degrees therefrom, and a fellow of the Geological Society of America. He was research geologist for the Research Division of the Louisiana State Geological Survey, and was the author of numerous publications on the subject of accretions and alluvium deposits which have been formed by the action of the Mississippi River. As consultant of the Mississippi River Commission he had organized the field force and had made intensive study on the ground of the shifting channel changes of the Mississippi River; bank control; seepage problems, alluvium and sand deposits, soil, sand bars, bank cavings, land formations, and various vegetation and timber growths along the River. He was employed by Learned to make a special study of these matters in the vicinity of the land in question. This he did from aerial photographs, topography maps, sketches and charts, and mosaics, including those of this nature introduced on the third trial, and those prepared by himself, and by going upon the land and making an examination on the ground of the trees, vegetation, and soil, including deep borings, bank surveys, sand bars, soil exposures along the river bank, etc. The various charts, maps, sketches, and photographs prepared by him and also those used as a basis of his study prepared by others were all introduced in evidence and were explained before the Chancellor. After all of this Dr. Fisk announced these conclusions:

1.   That prior to 1850 the migration of the Mississippi River gradually moved in a northwesterly direction away from Sections 5 and 6, Township 14 N, Range 2 E, in Warren County, Mississippi, which sections were owned by Learned at the time of the trial and by his predecessors in title, and by such movement formed a "point bar" on the Mississippi side of the River channel, and that the area known as Diamond Island was the head of this point bar and was a part of the mainland of Mississippi.

2.   That subsequent to 1850 a pilot chute cut across this point bar and that this chute gradually widened until in 1874 the main flow of the river in this chute and that which flowed west of Diamond Island were about equal.

3.   That subsequent to 1874 and before 1885 the channel on the west of Diamond Island gradually filled and the cut-off to the east gradually deepened and widened, so that by 1885 or 1886, the channel to the west had gradually filled and the water at low tide ceased to flow through it, and the cut-off widened and deepened, so that the cut-off became the main channel, but that this cut-off originally was by avulsion and the line between the States of Mississippi and Louisiana remained west of Diamond Island under the doctrine announced in Sharp et al. v. Learned, 182 Miss. 333, 181 So. 142, 143, 182 So. 122, "The boundary line of a navigable river between two states is the thread of the stream and continues with gradual changes in the thread; however, if the thread is changed by an avulsion the line remains where it was."

He then fixed the line between the two states as to these litigants, and the situs of the land in question as being in Mississippi.

He offered in evidence his mosaic, the various maps, plats, sketches and photographs and explained from these to the chancellor the reasons for his conclusions.

Appellants, in a strong argument, attack the accuracy of these conclusions, making the contentions, among others, (1) that the plats prepared by Fiske do not show certain physical objects shown on other plats and maps

in evidence; that (2) the conclusions are in conflict with certain physical objects; and (3) that in some material respects the conclusions are contrary to conclusions of witness Rhodes, Engineer for the United States River Commission, who testified in behalf of Learned on the third trial, and to whose testimony was exhibited many maps, plats, and drawings, some made by the River Commission Engineers and others and some by Rhodes himself, and whose evidence was in the record of the third trial, and which record, as stated, was introduced by Sharp and Stricker on the present trial. Fisk was not cross-examined. He was not asked to explain any omissions of any physical objects from his plats and drawings, and whether, if there were omissions, this was intentional or considered by him pertinent to the issue being developed, nor was his attention directed to alleged conflicts between his conclusions and any physical object on other maps or plats, nor was he called upon to explain any apparent discrepancy between his conclusions and those of the witness Rhodes. In any event, the weight of his testimony, as well as that of the other witnesses and exhibits, was for the chancellor, who, no doubt, heard and weighed the same attack upon Fisk's testimony as has been made here.

We will mention another specie of evidence which supports the finding of the chancellor and which is very persuasive to us here. Mr. A. J. Seviers testified (and there is no contradiction whatever of his testimony) that he had been sheriff and tax collector of Madison Parish, Louisiana, for thirty-six and one-half consecutive years prior to the trial and was deputy sheriff in that office for eight and a half years before he became sheriff—a total of forty-five years—and that Diamond Island, or Diamond Island Towhead, had never been assessed for ad valorem taxes in Louisiana, and that no one had ever paid taxes thereon in that State, during that time; nor had any resident of that Island ever been called upon or ever paid any poll or other taxes as a citizen of the

State of Louisiana, and that during his tenure of office he had never exercised any jurisdiction, civil or criminal, over that territory as being in Louisiana. On the other hand, the record discloses that since, and including, the year 1889, down to and including the year 1941, the year in which the third trial was had, the area was assessed for taxes and taxes paid thereon as being in Warren County, Mississippi, the form of the assessment usually being "Diamond Island," or "Diamond Island Towhead," the further description "and accretions" sometimes being added, and locating the lands in or opposite said Sections 5 and 6. Beginning in 1938 such has been the form of the assessment of the lands in Warren County to Learned as the owner thereof. The records of that County also show various conveyances of title, at different dates, between the owners as shown by the assessment rolls, the descriptions usually referring to the area as Diamond Island or Diamond Island Towhead and the accretions thereto, and often locating it as being west of Sections 5 and 6, Township 14, Range 2 E, several of these using the expression "Generally known as Diamond Island." On the other hand, while the record contains conveyances of Sections 7, 8 and 9 in Louisiana and some of these refer to the accretions thereto being included, we have not noted that any of them specify Diamond Island or Diamond Island Towhead.

In addition to the foregoing, we might add that in this case the chancellor was peculiarly in better position to understand and interpret these various maps, charts, etc., than is this Court for the reason that often in testifying the witnesses would refer to the place on the maps and charts as "here" or "there," pointing out the courses and directions and objects by tracing their fingers across the maps and showing the chancellor their location without any oral designation which enables us to know what the witnesses meant. However, the chancellor saw all of this and understood the meaning, or else would have inquired further of the witnesses what they meant.

We might add, in conclusion, that when the issue of the ownership of the timber was being tried on the present trial the burden of showing ownership was upon Sharp and Stricker, who were then introducing proof on that issue as cross-complainants, and they have to bear the burden of doubts and uncertainties as to that ownership if such exists.

Affirmed.