## JOHNSTON, et al. *v.* STATE

No. 40626          November 18, 1957          98 So. 2d 445

*Frank Shanahan, Jr.,* Vicksburg; *Swep S. Taylor, Jr.,* Jackson; *Albert S. Johnston,* Carthage, for appellants.

*G. Garland Lyell, Jr., Asst. Atty. Gen.,* Jackson, for appellee.

ETHRIDGE, J.

Appellants Johnston, Price, and Kinard were convicted in the County Court of Warren County of a misdemeanor for a willful trespass upon the land of Lester J. Meng, Lester J. Meng, Jr. and James C. Meng. Defendants waived a jury trial, and by agreement the county court judge heard the case on both the law and facts.

The final judgment, affirmed by the circuit court, found defendants guilty as charged.

The prosecution was based upon Code Section 2406: "Any person who shall be guilty of a willful or malicious trespass upon the real or personal property of another, for which no other penalty is prescribed, shall, upon conviction, be fined not exceeding five hundred dollars, or imprisoned not longer than six months in the county jail, or both."

The affidavit charged that defendants did willfully and unlawfully trespass upon the land of the three Mengs, "to-wit, that certain land located in Sections 5 and 6 in Township 14, Range 2 East, in said county, conveyed by General Box Company, a Delaware Corporation, to said Lester J. Meng, Lester J. Meng, Jr., and James C. Meng, and did willfully and unlawfully cut certain trees and timber on said land, having been previously notified and requested not to go upon said land and not to cut said trees and timber."

█ █ The latter part of the affidavit indicates some reliance upon Code Section 2411, which provides that, if a person shall go upon the enclosed land of another without his consent, after having been notified not to do so, he is guilty of a misdemeanor. However, it is not claimed that the lands here in question were enclosed, so the prosecution cannot come within Code Section 2411. Cf. Knight v. State, 64 Miss. 802, 2 So. 252 (1887); Lott v. State, 159 Miss. 484, 132 So. 336 (1931).

█ █ The conviction must be based upon Code Section 2406. That statute requires that there must be (1) a trespass, (2) which is willful or malicious, and (3) upon the property of another. It has been held that under the act "it is necessary to both allege and prove the ownership of the property trespassed upon." Adams v. State, 152 Miss. 220, 225, 119 So. 189 (1928).

It is undisputed that defendants willfully entered upon the property in question and cut trees upon it. The

questions here are (1) whether the State offered sufficient evidence supporting title to the land in the Mengs to make the question of ownership an issue for the trier of facts and law; and (2) whether there was enough evidence to warrant the finding of the trial court that defendants willfully trespassed upon the land and did not enter in good faith under a bona fide claim of title and with reasonable prudence. In brief, were the convictions against the overwhelming weight of the evidence?

### 1.

The land involved is on the west side of the present Mississippi River in an area known as Diamond Point. The alleged trespass was made upon a small part of this total area, which aggregates about 25,000 acres. It is sixteen miles south of the City of Vicksburg. Although Diamond Point is located west of the present Mississippi River, the land is in the State of Mississippi. Appellants concede this. It is in the shape of a large thumb approximately four miles in length. The thread of the main channel of the Mississippi River almost one hundred years ago was east of the land in question, but over a period of years a point bar was formed and built by erosion of the territory of Louisiana on the right bank of the river and by accretion to the mainland of Warren County, Mississippi, in a northerly and westerly direction. As the point bar thus moved the thalweg or main navigable channel of the river, which formed the boundary between Louisiana and Mississippi, also moved in a northerly and westerly direction until it reached a position in 1864 around to the north and west of what is now called Diamond Island.

Some time between 1864 and 1866 the river, by an avulsion during a period of highwater, cut across the point bar and formed a chute cutoff, which later developed and widened until the main portion of the river's flow was diverted into it, and the former main channel around the island and Diamond Point ceased to be navigable and

was filled by deposits of gravel, sands and other materials. In 1933 the U. S. Corps of Engineers completed an artificial cutoff across the east base of Diamond Point.

A controversy arose between the States of Mississippi and Louisiana with reference to whether the Diamond Point area was in Mississippi or Louisiana. In 1953 the State of Mississippi filed a suit against the State of Louisiana in the Supreme Court of the United States. That Court appointed a special master to hear the evidence and make findings of fact and law, with recommendations to the Supreme Court. Mississippi v. Louisiana, 346 U. S. 862, 74 S. Ct. 102, 98 L. Ed. 374 (1953). Two private persons claiming title through Louisiana petitioned for leave to intervene as codefendants, but this petition was denied. 348 U. S. 805, 75 S. Ct. 23 (1954). The special master heard considerable testimony on the issue of whether the Diamond Point area was in Mississippi or Louisiana. He found that it was located in the State of Mississippi, and fixed its specific boundaries. He held that, where the main channel of a stream forms a boundary between states, and gradual changes wrought by natural causes occur in the physical typography of the banks and in the channel of the stream, the main channel of the stream, in whatever changed location it may be, continues to be the boundary. When, however, from any cause, natural or artificial, a boundary river suddenly leaves its old channel and seeks a new bed, this sudden and rapid change is termed an avulsion, and the resulting change works no change of boundary, which remains in the middle of the old channel, although no water may be flowing in it, and irrespective of subsequent changes in the new channel.

Diamond Point was formed by accretions to the mainland of Mississippi in Warren County, Mississippi, although a small part of the accretions in the Diamond Island area are in Louisiana. In brief, the special master found that the Diamond Point area was formed by ac-

cretions to the territory of Warren County, Mississippi, and by the washing away of the lands in Louisiana by the river. The man-made Diamond cutoff, changing the main stream of the river to a place east of the Diamond Point area, did not change the fact that the area is a part of Mississippi and formed by accretions to Mississippi territory.

On October 17, 1955, the Supreme Court of the United States approved and adopted the report of the special master, overruled exceptions to it, and entered a decree fixing the boundaries between the two states as recommended by the special master. Mississippi v. Louisiana, 350 U. S. 5, 76 S. Ct. 29, 100 L. Ed. 6 (1955).

2.

On September 26, 1956, the defendants came upon a portion of the land for the purpose of cutting timber thereon. H. L. Temple, logging superintendent for the Mengs, notified defendants to leave the property, telling them that it was owned by the Mengs. However, one of the defendants, Johnston, advised Temple that he and A. D. Wright, the sole stockholders of T. & L. Enterprises, Inc., had purchased a deed to the property from Edward Hunter of Louisiana. So the defendants went ahead and cut about $750 worth of timber on the land before they were stopped by the Sheriff of Warren County. This prosecution followed.

A summary and analysis of the evidence is necessary in order to understand the issues. The General Box Company on August 30, 1956, conveyed to the Mengs as tenants-in-common Sections 5 and 6, T. 14 N., R. 2 E., Warren County, Mississippi, and all of the accretions thereto for a consideration of $158,000. The Mengs operate as Natchez Veneer and Lumber Company, a corporaration. Lester J. Meng, Jr. testified that the corporation had owned that property since the date of the deed and was the owner at the time of the trespass; that defendants cut about 25,000 feet of timber; that the Mengs

did not give them permission to go on the land or to cut the timber; and that the land entered by defendants was that conveyed to the Mengs, and it was part of the accretions to the aforesaid Sections 5 and 6 of Warren County.

John H. Hyland, an experienced civil engineer, has lived within five miles of this land and has personally been familiar with it since about 1905. The land constitutes accretions, he said, to Sections 5 and 6, T. 14 N., R. 2 E., Warren County, Mississippi. He testified that he was one of the Hankerson heirs who originally owned all of this land and who sold it to E. G. Stockard in 1930. Stockard then sold it to Nichols, who in turn sold the land to LaCosta. LaCosta sold the land to the General Box Company, who in turn conveyed it to the Mengs in 1956, Hyland discussed the history of the accretions to Sections 5 and 6. He was unequivocal that the land constituted accretions to these Sections 5 and 6.

The place on the Diamond Point area where defendants cut the timber is about three to four miles from the original Sections 5 and 6. Hyland said, from his study of earlier hydrographic maps of the area, that accretions began building in front of Sections 5 and 6 around 1843. In 1913 the accretions had built into the existing Sections 5 and 6, and thereafter the river changed its course, apparently through the Diamond cutoff, and washed away completely the original Sections 5 and 6. Temple, logging superintendent, also testified that the lands upon which defendants entered were accretions to Sections 5 and 6 of Warren County, Mississippi.

Dave Forrester, a Vice President of General Box Company, stated that General Box Company purchased the land about 1944 from Arno LaCoste. Afterwards the company cut a good deal of timber off Diamond Point two or three different times. It also issued fishing and hunting permits on several occasions to individauls. General Box Company owned and occupied the land for

approximately eleven years, and "there is no doubt in my mind that the timber which was cut that I saw was on Diamond Point and on the property which we sold to Natchez Veneer and Lumber Company."

Defendants then undertook to show a claim of title to the land under a Louisiana chain of title. On June 26, 1956, Edward Hunter, a resident of Madison Parish, Louisiana, quitclaimed and conveyed to A. D. Wright and M. W. Johnston for a consideration of $350 as follows: "Section twenty-six (26), Township Fourteen (14) North, Range Fourteen (14) East, Madison Parish, Louisiana.

"The vendor herein is advised that the above described property is now located in Warren County, Mississippi, Township Fourteen (14), Range Two (2)." On September 24, 1956, Johnston and Wright conveyed to T. & L. Enterprises for a consideration of $5,000 all of the timber on the property under the same description.

M. H. James, Jr. is a land surveyor. At the request of defendants he came to Warren County and, he said, located on the ground Section 26, T. 14 N., R. 14 E., Warren County, Mississippi, which was formerly in Madison Parish, Louisiana. He offered in evidence a survey made by him, which purports to be a map of the aforesaid section which was originally in Madison Parish, Louisiana, and now, he said, is in T. 14, R. 2 E. of Warren County, Mississippi. He used the original government field notes made around 1830. The land which he surveyed as Section 26, he testified, is the land on which the defendants cut timber.

However, on cross-examination the value of James' testimony was considerably diminished. He admitted that the river does not run now in the way his map shows. His survey reflects the river's course in 1830. He did not know the various changes in the river since his 1830 reference point. Nor did he know that later surveys show that the land in Louisiana west of the river in 1830 was completely washed away at this point. He

could not locate the river's present course. He did not undertake to trace the boundary between the two states. All he did was to locate a section in Louisiana as it existed in 1830. He did not consider the decision of the U. S. Supreme Court. He had no knowledge as to whether the original Louisiana sections completely washed away. He said: "If the land (which) was in Louisiana was in fourteen (14) fourteen (14), and it starts up there and measures down to that end it's there now. I can't say it's the same land but it's the same place."

Johnny Woodrick, who lives in Madison Parish, Louisiana, said he was acquainted with the location of Section 26, T. 14, R. 14; that prior to June 1956 Ed Hunter owned the land for at least forty years, until he conveyed it to Johnston and Wright. He said that the section where the timber was cut by defendants was Section 26, T. 14, R. 14. Woodrick is a farmer and sometimes acts as a chain man for surveyors.

A. D. Wright, a defendant, testified that he and Johnston purchased from Ed Hunter, Section 26, T. 14, R. 14 East. He ascertained that Hunter owned it in Louisiana, and the Supreme Court decision "had put it in Mississippi in 2." After the survey was made by James, they went on the land and started cutting timber. T. & L. Enterprises, Inc. is a Mississippi corporation formed by Wright and Johnston. The corporation paid them $5,000 in stock for the transfer of the timber to the corporation. They paid Hunter $350 for the land in Section 26. Wright testified that the property upon which they cut the trees was the same property obtained under the timber deed. Before the decision in Mississippi v. Louisiana, the land was in Louisiana. In other words Wright's position is that what was Section 26, T. 14 N., R. 14 E., Madison Parish, Louisiana, is now one and the same as Section 26, T. 14 N., R. 2 E., Warren County, Mississippi. But he overlooks the fact that the great weight of the evi-

dence shows that the Louisiana section was washed away by the river.

3.

Was the finding of the trier of fact, that the State proved title in the Mengs to the property upon which the trespass was committed, against the overwhelming weight of the evidence? We think not. The evidence amply warranted the finding that the ownership of the land was in the Mengs. The civil engineer Hyland traced the record title to the land back for over fifty years. Lester J. Meng, Jr., and Forrester, Vice President of General Box Company, supported Hyland's testimony. The State also introduced into the record the deed from General Box Company to the Mengs, dated August 30, 1956. The testimony of Hyland is undisputed that the land in question constitutes accretions to Sections 5 and 6, T. 14 N., R. 2 E., Warren County, Mississippi. The decision of the Supreme Court of the United States in Mississippi v. Louisiana specifically found that the Diamond Point area was made up of accretions to Warren County, Mississippi.

On the other hand, the defendants did not dispute the testimony for the State that the land in the Diamond Point area constituted accretions to Sections 5 and 6 in Warren County. Their defense was that, although the land is now in Warren County, until the decision of the U. S. Supreme Court, it was in Louisiana and was properly described as Section 26, T. 14 N., R. 14 E., Madison Parish, Louisiana. The difficulty with this position is that the overwhelming weight of the evidence shows that as the river moved northerly and westerly in the early 1800's, the Louisiana land was eroded, washed into the river, and disappeared as land subject to ownership in Louisiana.

This also was found as a fact by the Supreme Court of the United States in Mississippi v. Louisiana. The special master's report stated that the undisputed evi-

dence showed the land on the former Louisiana bank of the river "was eroded by action of the river over a long period of years and caved into the Mississippi River and disappeared."

Two cases concerning accreted lands in the Diamond Point area deal also with the discontinuance of Louisiana titles by their erosion and washing away by the river, and the later additions of accretions to the Mississippi territory. In Sharp v. Learned, 202 Miss. 393, 32 So. 2d 141 (1947), Learned in 1937 cut timber on the Diamond Island area. Sharp and Stricker contended that they owned the timber and the land, claiming only through Louisiana title sources. Learned asserted ownership through Mississippi title sources, on the ground the timber was upon accretions to Sections 5 and 6, T. 14 N., R. 2 E., Warren County, Mississippi. That is the same contention made by the Mengs in this case as to other lands in the Diamond Point area. Learned brought suit in the chancery court to enjoin Sharp and Stricker from prosecuting a suit against him in Louisiana. The chancery court's decree for Learned, the complainant, was affirmed by this Court. The chancellor found that the land was located in Warren County, Mississippi, and defendants, claiming under a Louisiana source, had no title. The court stated that prior to 1850 the Mississippi River gradually moved in a northwesterly direction away from Sections 5 and 6 in Warren County, Mississippi, and that the chancellor was warranted in finding that the Diamond Island area constituted accretions to Sections 5 and 6.

In Iselin v. LaCoste, 139 Fed. 2d 887 (C. C. A. 5th, 1944), Iselin sued LaCoste in the District Court for the Southern District of Mississippi to secure a declaratory judgment that he and other plaintiffs were owners of certain lands in the Diamond Point area, on the theory that they were in Louisiana. Dismissal of the suit was affirmed. The land "though originally a part of Louisiana,

now lies in Warren County, Mississippi.'' The movement of the land was caused gradually over a period of half a century by natural causes in changes of the river. The Court said: ''Irrespective of to whom the land in controversy once belonged, it has become the property of the riparian proprietor of the Mississippi shore adjacent to the island.'' In other words, when the land on the west or Louisiana side of the river has been eroded and washed away by the river over a long period of time, and accretions have been added to the Mississippi shore, the former Louisiana titleholders cannot claim title to the accretions formed by the river to the Mississippi territory, even though the same nexuses of lattitude and longitude are involved. The accreted lands have become the property of the riparian owners of the Mississippi shore. See also Iselin v. LaCoste, 147 Fed. 2d 791 (C. C. A. 5th, 1945).

These principles are equally applicable to the contentions of appellants in the instant case. Assuming that defendants are claiming under record titleholders of Louisiana land which was washed away by the Mississippi River more than seventy-five years ago, although they offered no evidence of a record chain of title, they have nevertheless lost that land, which was eroded and destroyed by the Mississippi River. The trial court was therefore warranted in finding that ownership of the land upon which the trespass occurred was in the Mengs, the prosecuting witnesses, claiming as owners of accreted lands. Of course this suit is not one to try title. What we hold is that from the evidence in this case the State met its burden of proof to show ownership in the Mengs of the property upon which the trespass occurred.

4.

The other question is whether there was enough evidence to warrant the finding of the county court that the defendants did not enter in good faith under a bona fide claim of title.

■■ One who acts in good faith and with reasonable prudence, under a belief that the land in question is his own, is not criminally liable for willful or malicious trespass under Code Section 2406. 3 Burdick, Law of Crime (1946), Section 720, p. 72. See also Annotation 146 A. L. R. 655 (1943); 52 Am. Jur., Trespass, Section 85. This case does not involve a prosecution for willfull trespass where there is a boundary dispute. See Bacot v. State, 158 Miss. 258, 130 So. 282; Evans v. State, 159 Miss. 870, 132 So. 456 (1931). Section 2406 includes "The idea of an act intentionally done with a wrongful purpose." Bacot v. State, supra.

■■ The trespass was willful and intentional, and we think the county court was warranted in finding that defendants did not act in good faith and with reasonable prudence, under the belief that the land in question was their own. Certainly we cannot say that a finding to this effect was against the great weight of the evidence.

■■ Appellants also complain because the county court denied them a severance. Code 1942, Section 2515, permits one in misdemeanor cases in the sound discretion of the trial court. The facts as to the trespass were the same as to all these defendants. Hence there was no abuse of discretion in denying the motion. Boyd v. State, 177 Miss. 34, 39, 170 So. 671 (1936).

Affirmed.

*McGehee, C. J.,* and *Lee, Holmes* and *Arrington, JJ.,* concur.